# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br>NICHOLAS PRICE<br><br>*Defendant(s)* | )<br>)<br>) Case No. 2:24-mj-105<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2021 to 2023__ in the county of __Franklin__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 USC 1956(a)(1)(B)(i) | Concealment Money Laundering |
| 18 USC 1343 | Wire Fraud |

This criminal complaint is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Borton Kyle M
Digitally signed by Borton Kyle M
Date: 2024.02.27 15:28:54 -05'00'

Kyle Borton, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 02/27/2024

City and state: Columbus, Ohio

Kimberly A. Jolson
United States Magistrate Judge

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

### AFFIDAVIT
IN SUPPORT OF CRIMINAL COMPLAINT

I, Kyle Borton, Special Agent, U.S. Department of the Treasury, Internal Revenue Service, Criminal Investigation, being duly sworn, depose and say that:

### Introduction and Purpose

1. I am a Special Agent with IRS-Criminal Investigation and have been so employed since 2020. I have received specialized law enforcement training at the Federal Law Enforcement Training Center, Glynco, Georgia and additional specialized training from the IRS. My duties as a Special Agent include conducting investigations of individuals and businesses that have violated Federal Law, particularly those laws found under Title 18, Title 26 and Title 31 of the United States Code. I have participated in multiple such investigations, including but not limited to, investigations of persons or organizations involving tax evasion, wire fraud, identity theft, and money laundering. I have consulted with senior agents in my office regarding this affidavit who have investigative experience regarding the specific violations outlined herein.

2. In 2023, IRS-Criminal Investigation initiated an investigation on **NICHOLAS PRICE (PRICE)**. Based upon the facts presented in this Affidavit and my experience, there is probable cause to believe **PRICE** engaged in a wire fraud scheme, in violation of 18 U.S.C. § 1343, in the Southern District of Ohio, and **PRICE** laundered the proceeds of wire fraud by concealing the nature of the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

3. As a result of your affiant's personal participation in this investigation, as well as information provided to your affiant by other federal and state law enforcement officers, I am familiar with the information submitted in this Affidavit. This Affidavit is being submitted for the limited purpose of requesting the issuance of a Criminal Complaint and Arrest Warrant for **PRICE** for violations of 18 U.S.C. § 1343 and 18 U.S.C. § 1956(a)(1)(B)(i). Accordingly, I have not included each and every fact known to me concerning this investigation.

### Background

4. **PRICE** owns and operates RIGHT PRICEIT LLC (RIGHT PRICEIT). RIGHT PRICEIT is an IT consulting company. **PRICE** has been described, by a witness, as a "middleman" between IT vendors and a client, who is the end user of the product.

5. Jo Fruechtnicht (Fruechtnicht), Director of Business Development at Single Source IT (SSIT), was interviewed by your affiant and other law enforcement officers. Fruechtnicht noted the State of Ohio and its specific departments consider whether a company is a Minority Business Enterprise (MBE) when determining who to reward state contracts to. Fruechtnicht's company, SSIT, is an MBE. **PRICE'S** company, RIGHT PRICEIT, is not an MBE. **PRICE** was "buddy-

buddy" with a lot of people at the State of Ohio, and often knew of potential contracts before they were posted or opened to accepting bids. **PRICE** has an agreement with vendors/suppliers, which Fruechtnicht referred to as "deal reg", that guarantees a better price on products sold to RIGHT PRICEIT than anyone else. Essentially SSIT can either work with RIGHT PRICEIT in order to fulfill contracts with the State of Ohio, in order to leverage **PRICE'S** "deal reg", or pass up on the contract with the State. Based upon the pricing RIGHT PRICEIT was able to secure with vendors, SSIT knew they would be able to submit the lowest bid and win the contracts with the State as an MBE.

6. According to Fruechtnicht, **PRICE** was not able to bid on State contracts directly because was not on the "Citrix STS" (State Term Schedule), which was a requirement. Additionally, some contracts required an MBE, but RIGHT PRICEIT was not an MBE.

## Evidence in Support of Probable Cause

### THEFT 1

7. According to public records related to a civil complaint filed in Colorado against RIGHT PRICEIT, EC America Inc. (EC America) is a subsidiary of immixGroup, an Arrow Company. immixGroup helps technology companies do business with the government. In this instance, EC America agreed to sell products to RIGHT PRICEIT. RIGHT PRICEIT provided purchase orders to EC America, and EC America provided invoices to RIGHT PRICEIT.

8. In her interview, Fruechtnicht noted **PRICE** had already learned about the upcoming contracts with the State of Ohio agencies Ohio Department of Transportation (ODOT) and Ohio Department of Natural Resources (ODNR) – (see below paragraphs for more detail) before they were posted for bid. **PRICE** agreed to purchase the equipment needed to fulfill the contracts from EC America, at the "deal reg" price, and then **PRICE** reached out to SSIT about the upcoming contracts. Based off **PRICE'S** agreement with EC America, SSIT knew they would win the contracts. SSIT reached out to EC America to get a quote on pricing the contract without RIGHT PRICEIT, but it was not as competitive (cheap) as what **PRICE** could get.

9. Fruechtnicht noted the ODOT and ODNR contracts required an MBE. That is why **PRICE** reached out to SSIT to bid on these contracts.

10. It is your affiant's understanding, based on business records from EC America and SSIT, as well as witness statements, that the products RIGHT PRICEIT purchased from EC America would eventually be delivered to the end users (ODOT and ODNR). The payment for these products would then follow this path; State of Ohio (ODOT and ODNR) would pay SSIT, SSIT would then pay RIGHT PRICEIT, RIGHT PRICEIT was then responsible for paying EC America. In both of these instances, **PRICE** stole the money he was responsible for sending to EC America.

11. According to public records related to a civil complaint filed in Colorado against RIGHT PRICEIT, on or around October 18, 2019, RIGHT PRICEIT and SSIT agreed to a deal and signed a security agreement with Arrow (EC America) in which EC America would sell products

to RIGHT PRICEIT, and SSIT who would then sell the products to ODOT. The agreement was for a three-year period. RIGHT PRICEIT issued purchase order 10162019NPDOT321500, dated October 16, 2019, to EC America for $1,142,130. This was the total price of the three-year agreement. According to business records, EC America invoiced RIGHT PRICEIT on an annual basis for the portion of the $1,142,130 due that year.

12. According to public records related to civil complaint filed in Colorado against RIGHT PRICEIT, on or around September 30, 2020, **PRICE** executed a personal guaranty to Arrow (EC America) in which Arrow extended credit to RIGHT PRICEIT regarding the purchase order for ODNR. The agreement was for a three-year period. RIGHT PRICEIT[1] issued purchase order 0929CITRIXDNRECAMERIC, dated September 29, 2020, to EC America for $1,028,713.92. This was the total price of the three-year agreement. According to business records, EC America invoiced RIGHT PRICEIT on an annual basis for the portion of the $1,028,713.92

13. Business records from EC America indicate, on or around October 19, 2021, invoice ECINV153692 was issued by EC America to RIGHT PRICEIT for $380,380. The due date of this invoice was November 18, 2021. The order number referenced was 10162019NPDOT321[2], the ODOT agreement noted above in paragraph 11. **PRICE** never paid this invoice.

14. Business records from EC America indicate, on or around October 1, 2021, invoice ECINV152783 was issued by EC America to RIGHT PRICEIT for $308,482.16. The due date of this invoice was October 31, 2021. The order number referenced was 0929CITRIXDNRECA[3], the ODNR agreement noted above in paragraph 12. **PRICE** never paid this invoice.

15. The total amount of unpaid invoices referenced above is $688,862.16.

16. According to business records from SSIT and interview of Fruechtnicht, on or around August 16, 2021, invoice #1092 was issued by RIGHT PRICEIT and emailed to Fruechtnicht at SSIT for $420,860. The invoice references "For ODOT Citrix year 3 deal." On or around August 16, 2021, invoices #1093 and #1094 were issued by RIGHT PRICEIT and emailed to Fruechtnicht at SSIT. Invoice #1093 was for year 2 of technical services related to the ODNR deal for $66,998.75. Invoice #1094 was for year 2 of the ODNR deal, **PRICE** attempted to invoice SSIT for $411,950. In her interview, Fruechtnicht noted the price increase from year 1 was unjustified, and SSIT only paid $406,950. Invoice #1093 and the amount SSIT paid on invoice #1094 totals $473,948.75.

---

[1] The purchase order uses the name Goldtech, in place of RIGHT PRICEIT. Based on the address and the email address matching the purchase order referenced in paragraph 12, as well as the signature appearing to be **PRICE**, it is believed RIGHT PRICEIT was purchasing the product. The personal guaranty for this deal was signed by **PRICE**, and his title below the signature is President/CEO of RIGHT PRICEIT.
[2] The purchase order referenced in the invoice was a truncated version of the full purchase order 10162019NPDOT321500. Based upon the part numbers, descriptions, end user, and all other attributes of this invoice, it is believed that this invoice relates to the full purchase order 10162019NPDOT321500 sent by **PRICE** on October 18, 2019.
[3] The purchase order referenced in the invoice was a truncated version of the full purchase order 0929CITRIXDNRECA. Based upon the part numbers, descriptions, end user, and all other attributes of this invoice, it is believed that this invoice relates to the full purchase order 0929CITRIXDNRECAMERIC sent by **PRICE** on September 29, 2020.

17. According to business records from SSIT and the interview of Fruechtnicht, on or around August 16, 2021, **PRICE** emailed the invoices, noted in paragraph 16, directly to Fruechtnicht. The subject line of this email was "Invoices that are due asap!" Fruechtnicht noted this was strange because **PRICE** understood his payment would not be issued until ODOT and ODNR paid SSIT.

18. According to Ohio Checkbook, a public website that shows money spent by different departments within the State of Ohio, on or around September 21, 2021, ODOT issued a $434,885 payment to SSIT, transaction ID #1407258. On or around November 18, 2021, ODNR issued a $491,204.44 payment to SSIT, transaction ID #793876.

19. According to bank records, JP Morgan Chase Bank business checking account ending in #2622 (Chase 2622) was opened on June 21, 2021, by **PRICE**, in the name of RIGHT PRICEIT. On October 7, 2021, **PRICE** deposited check #2026 from SSIT, for $420,860, into Chase 2622. On November 26, 2021, **PRICE** e-deposited check #2007 from SSIT, for $473,948.75, into Chase 2622.

20. According to bank records, on October 6, 2021, the ending balance of Chase 2622 was $3,232.34. The ending balance of Chase 2622 as of January 4, 2022, was -$1,166.42. Between October 6, 2021, and January 4, 2022, a total of $977,600.70 was deposited into Chase 2622. Of this $977,600.70, $688,862.16 was the money **PRICE** owed to EC America. All of the money owed to EC America was moved out of Chase 2622 by January 4, 2022, due to the negative balance in the account as of that date.

21. Analysis of bank records indicates that, between November 17, 2021, and December 20, 2021, **PRICE** withdrew $696,000 from Chase 2622 in the form of wires and cash withdrawals. Of the $696,000, $695,000 was deposited into an individual's account who is a known associate of **PRICE**. For the purpose of this affidavit, the individual will be referenced as Associate 1. Your affiant knows the true identity of Associate 1. Below is a breakdown of the money out of Chase 2622 and into Associate 1's bank account:

Money out of **PRICE'S** Chase 2622:

| Date | Type/Description | Amount |
| --- | --- | --- |
| 11/17/2021 | E-Withdrawal | $ 70,000 |
| 11/18/2021 | Wire Transfer Associate 1 | $ 50,000 |
| 11/19/2021 | Wire Transfer Associate 1 | $ 50,000 |
| 11/19/2021 | Cash Withdrawal | $ 50,000 |
| 11/23/2021 | Wire Transfer Associate 1 | $ 5,000 |
| 11/26/2021 | Cash Withdrawal | $ 40,000 |
| 11/29/2021 | Cash Withdrawal | $ 70,000 |
| 12/02/2021 | E-Withdrawal | $ 41,000 |
| 12/02/2021 | E-Withdrawal | $ 10,000 |
| 12/03/2021 | Cash Withdrawal | $150,000 |
| 12/08/2021 | Cash Withdrawal | $125,000 |

| 12/14/2021 | Wire Transfer Associate 1 | $ 25,000 |
| 12/20/2021 | Wire Transfer Associate 1 | $ 10,000 |
| TOTAL | | $696,000 |

Money into Associate 1's Account:

| Date | Type/Description | Amount |
|---|---|---|
| 11/17/2021 | Cash Deposit | $ 70,000 |
| 11/18/2021 | Credit B/O: Right PriceIT LLC | $ 50,000 |
| 11/19/2021 | Credit B/O: Right PriceIT LLC | $ 50,000 |
| 11/19/2021 | Cash Deposit | $ 50,000 |
| 11/23/2021 | Credit B/O: Right PriceIT LLC | $ 5,000 |
| 11/26/2021 | Cash Deposit | $ 40,000 |
| 11/29/2021 | Cash Deposit * | $ 70,000 |
| 12/02/2021 | Cash Deposit ** | $ 40,000 |
| 12/02/2021 | Cash Deposit | $ 10,000 |
| 12/03/2021 | Cash Deposit | $150,000 |
| 12/08/2021 | Cash Deposit | $125,000 |
| 12/14/2021 | Credit B/O: Right PriceIT LLC | $ 25,000 |
| 12/20/2021 | Credit B/O: Right PriceIT LLC | $ 10,000 |
| TOTAL | | $695,000 |

* This deposit slip was signed by **N. Price**
**PRICE** withdrew $41,000 from his account and Associate 1 only deposited $40,000

22. Analysis of bank accounts indicate, from December 27, 2021, through July 31, 2023, Associate 1 has sent **PRICE** at least $77,290 in the form of Zelle payments.

23. In her interview, Fruechtnicht noted, after failing to receive payment from RIGHT PRICEIT for the deals noted in the above paragraphs, EC America stopped doing business with RIGHT PRICEIT and SSIT. Fruechtnict communicated with **PRICE** via text message telling him EC America removed SSIT from the contracts because EC America had not received payment from **PRICE**. **PRICE** said "They are full of shit" and later in the conversation **PRICE** responded "If they say RIGHT PRICEIT didn't pay can you please forward me that email?"

## THEFT 2

24. According to public records related to a civil complaint filed in Illinois against RIGHT PRICEIT, MNJ Technologies Direct, Inc. (MNJ) is a nationwide digital transformation and information technology solutions consultant and provider. Starting in August 2019, MNJ started doing business with RIGHT PRICEIT. RIGHT PRICEIT sources and fulfills its customer's orders through MNJ with an obligation to pay MNJ for delivering the equipment directly to RIGHT PRICEIT's customer.

25. Business records from MNJ indicate, on or around May 19, 2022, MNJ salesman Jimmy Lochner sent quote #1419759 to RIGHT PRICEIT for the sale of $47,091.65 of equipment. On

5

or around June 16, 2022, **PRICE** sent purchase order NP061622VAR to MNJ accepting the terms of quote #1419759. **PRICE** specified the equipment should be delivered to Vargo. On or around August 22, 2022, MNJ processed the order and all equipment was accepted by Vargo. **PRICE** never paid MNJ for this order.

26. Business records from MNJ indicate, on or around June 6, 2022, MNJ salesman Jimmy Lochner (Lochner) sent quote #1423092 to RIGHT PRICEIT for the sale of $41,820 of equipment. On or around June 20, 2022, **PRICE** sent purchase order NP062022BEMCLNVO to MNJ accepting the terms of quote #1423092, but changed the quantity of equipment, with a new price of $25,980. **PRICE** specified the equipment should be delivered to Broadcast Educational Media Comm (BEMC). On or around October 17, 2022, MNJ processed order and all equipment was accepted by BEMC. **PRICE** never paid MNJ for this order.

27. The total amount of unpaid orders referenced above totals $73,071.65.

28. Business records from Vargo indicate, on or around June 22, 2022, RIGHT PRICEIT sent invoice 1114 to Vargo for $63,127.23. The equipment on the invoice appears to be the same equipment on purchase order NP061622VAR referenced in paragraph 25. On or around July 20, 2022, Vargo issued check # 23516 to RIGHT PRICEIT. Bank records indicate, on or around July 25, 2022, check #23516 from Vargo was deposited into Chase 2622.

29. Analysis of bank records indicate, on July 20, 2022, the ending balance of Chase 2622 was $56.24 and the ending balance as of August 10, 2022, was -$1,127.43. Below is a breakdown of apparent personal expenditures out of Chase 2622 during this span:

| Date | Type/Description | Amount |
|---|---|---|
| Multiple | ATM Withdrawals | $ 3,100.00 |
| Multiple | Zelle Payments to **NIC PRICE** | $15,308.00 |
| Multiple | Evi Cashclub Wallet NV Card (Casino) | $ 6,700.00 |

30. Bank records indicate Wells Fargo business checking account ending in 9410 (WF 9410) was opened by **PRICE**, on or around November 2, 2022, in the name of RIGHT PRICEIT. On or around November 28, 2022, **PRICE** deposited check #1274 from BEMC for $27,410. Analysis of this account shows that between November 28, 2022, and December 14, 2022, **PRICE** withdrew at least $19,847 in cash from WF 9410.

31. MNJ's collections specialist, Ernie Lamberg (Lamberg), emailed **PRICE** multiple times checking in on the status of the outstanding balance due. On December 30, 2022, Lamberg emailed **PRICE** requesting payment by the following week. **PRICE** responded "I have a big check clearing on (January) 4th that should knock almost all of this out. Sorry for the delay." No payment occurred. Lamberg followed up on January 10, 2023, asking if payment was made. **PRICE** responded "Ernie, not even trying to make excuses but when I set up my Wells Fargo they did not set up my wire. I'm actually in Florida now trying to fix it." Lamberg tried to follow up again on March 23, 2023, and April 5, 2023, but **PRICE** did not respond. Your affiant has reviewed these emails.

32. **PRICE** also communicated with MNJ salesman Lochner via text message. On December 16, 2022, **PRICE** texted Lochner "I'm finally getting a big payment today from Digitek that I've been waiting on for fucking months", "I will fly to Tampa tomorrow and put it in Wells Fargo! Once it clears I got you." On February 9, 2023, **PRICE** texted Lochner, "I've got a lot of shit going on and Wells Fargo is fucking me over fierce…I'm gonna pay you guys I just need to get this shit with Wells Fargo figured out. They won't let me pay over 25k…", "I'm really sorry man but like I said you don't have to worry about I will pay you", "I'm definitely not ducking anything." In March 2023, **PRICE** texted Lochner "I'm not Not going to pay it… it could be as soon as Tuesday for 100k." On March 31, 2023, **PRICE** texted "I'm supposed to see something today in which I intend to make some form of payment I'm literally still tapped." Your affiant has reviewed these text messages.

33. Bank records indicate that the big check **PRICE** referenced in communications with Lamberg and the Digitek check **PRICE** referenced with Lochner are the same check and it cleared in WF 9410, on December 22, 2022. **PRICE** also referenced with Lochner that Wells Fargo would not let him pay over $25,000. In January 2023, **PRICE** sent at least five wires that were $25,000 or over, out of WF 9410 (see Theft 3 below for further details regarding this check and these wires).

34. MNJ Senior Director of Sales Kevin Cowan emailed **PRICE** on June 21, 2023. Cowan proposed a payment plan for **PRICE** to pay the balance over 12 months. On June 29, 2023, **PRICE** responded "Yes, I agree to this plan can I have 30 days from today to start?" On June 30, 2023, **PRICE** added "I got like 15k coming here in the next few weeks… as soon as I get that I can give you guys the entire payment."

## THEFT 3

35. On or around May 5, 2023, Delaware County Sheriff's Office was contacted by Luke McGrath, a New York attorney representing ATSG, a software company based in New York. ATSG engaged in a software sale to the Ohio Department of Rehabilitation and Corrections (ODRC). The contract required an MBE. RIGHT PRICEIT was contacted to broker the deal, and **PRICE** brokered Digitek Software Inc. (Digitek) to fulfill the MBE role.

36. ATSG provided emails between **PRICE**, John Hinderer (Hinderer) an Account Executive with ATSG, Dennis Mitchell (Mitchell) an IT manager with ODRC, and BJ Dieterich (Dieterich) a Relationship Manager with Citrix. On or around May 25, 2022, Mitchell emailed Hinderer about entering the order/quote into OhioBuys, the website used for contract bids. Hinderer forwarded the message to **PRICE** and Dietrich about getting the information on the quote fixed. On July 20, 2022, Hinderer emailed **PRICE** and Dieterich noting Mitchell received the Digitek quote. Hinderer asked **PRICE** to complete three quotes, one referencing the MBE. On September 8, 2022, Dieterich emailed **PRICE** and Hinderer referencing the purchase orders/quotes being entered into OhioBuys. Specifically, "Can we please have the low-bid MBE reach out to ODRC finance and ask for PO status?"

37. It is your affiant's understanding, based on ATSG's business records and email communications, as well as a similar pattern established from Theft 1 above, the products

RIGHT PRICEIT purchased from ATSG would eventually be delivered to the end user, ODRC. The payment for these products would then follow this path; State of Ohio (ODRC) would pay Digitek, Digitek would then pay RIGHT PRICEIT, RIGHT PRICEIT was then responsible for paying ATSG. **PRICE** stole the money he was responsible for sending to ATSG.

38. Business records from ATSG indicate, on or around September 16, 2022, RIGHT PRICEIT sent purchase order NPATSGDRCCITRIX91622 to ATSG for $646,179.70. **PRICE** sent the purchase order via email to Hinderer with ATSG. The purchase order referenced ATSG as the vendor and the products being purchased were to be shipped to ODRC.

39. Business records from ATSG indicate, on or about September 28, 2022, ATSG emailed **PRICE** invoice #40372 based off the purchase order referenced in paragraph 38. **PRICE** followed up via email on September 29, 2022, asking to be billed in full for the total amount.

40. According to Ohio Checkbook, a public website that shows money spent by different departments within the State of Ohio, on or around December 6, 2022, ODRC paid Digitek $710,800.04, transaction IDs #01500123 and #01500124.

41. Bank records indicate, on or around December 22, 2022, **PRICE** deposited check #14326 from Digitek for $685,850.92, dated December 20, 2022, into WF 9410. The check appears to have cleared the same day, as it shows in the account balance as of the day of deposit.

42. Business records from ATSG indicate, on December 20, 2022, Hinderer forwarded **PRICE** an email from ATSG collections regarding the status of **PRICE'S** payment. That same day, **PRICE** responded "So here's the situation they just got paid I think last week! Chetan was in India. He's back now and submitting a check to me. I should get it Friday down here in Tampa. I then will deposit it which the banks have been assholes lately and so it will be a 10 business day hold! I'm trying to see if I cant get my branch manager down here to expedite that process! Stay tuned." **PRICE** never sent payment to ATSG. The total unpaid balance is $646,179.70.

43. Bank records indicate, on January 27, 2023, **PRICE** sent five wires to a group of associates who own and operate car dealerships. The identities of the associates are known but for the purpose of this affidavit, they are referenced as associates 2, 3, and 4. Below is a breakdown of the wires:

| Date | Dealership/Associate | Wire Memo | Amount |
|---|---|---|---|
| 1/27/2023 | Associate 2's Dealership | G63 partial payment | $100,000.00 |
| 1/27/2023 | Associate 3's Dealership | payoff | $ 20,988.20 |
| 1/27/2023 | Associate 4's Dealership | S65 AMG | $166,800.00 |
| 1/27/2023 | Associate 2's Dealership | payoff | $162,211.80 |
| 1/27/2023 | Associate 3's Dealership | Range | $ 65,000.00 |

44. Associate 2's Dealership was served a subpoena by the Delaware County Sheriff's Office regarding the above, alleged purchase of a vehicle by **PRICE**. Associate 2's Dealership could not produce records of a purchase and Associate 2 responded to the subpoena noting **PRICE** never bought any vehicles. The wires were for a loan. Associate 2 provided a promissory note for

8

a $450,000 loan starting on January 25, 2023. By February 9, 2023, Associate 2 agreed to pay **PRICE** $500,000.

45. Analysis of bank records indicate, starting February 1, 2023, and continuing through at least December 13, 2023, Associate 2 has sent **PRICE** $21,970 in Zelle payments through their personal account, other individuals' accounts who work at Associate 2's Dealership, and Associate 2's Dealership business account. One of the Zelles included in the $21,970 was a $1,000 Zelle payment from Associate 4's Dealership business account on February 21, 2023.

46. Analysis of bank records and cell phone records resulted in the following breakdown of communications between **PRICE** and Associate 2, and lining up the communications with the wires and Zelle payments sent from/to **PRICE** (Note this in not every payment sent to **PRICE**):

| Date of Communication | Type of Communication | Date of Zelle/Wire |
|---|---|---|
| 1/26/2023 | **PRICE** calls Associate 2 (x6) | 1/27/2023 (Wires) |
| 2/22/2023 | Associate 2 calls **PRICE** | 2/21/2023 (2 Zelles) |
|  |  | 2/22/2023 (1 Zelle) |
| 4/6/2023 | **PRICE** calls Associate 2 (x4) | 4/7/2023 (1 Zelle) |
| 5/3/2023 | **PRICE** calls Associate 2 (x2) | 5/3/2023 (1 Zelle) |
| 8/2/2023 | **PRICE** calls Associate 2 (x2) | 8/2/2023 (1 Zelle) |

47. Analysis of bank records indicate that on December 21, 2022, the ending balance of WF 9410 was $92.43. On February 27, 2023, the ending balance of WF9410 was -$613.58. Below are highlights of apparent personal expenditures, excluding the wires above in paragraph 43, that happened between the Digitek check being deposited on December 22, 2022, and the account balance being negative on February 27, 2023:

| Date | Type/Description | Amount |
|---|---|---|
| Multiple | Cash Withdrawals | $38,300.00 |
| Multiple | Apple Cash (sent) | $33,764.97 |
| Multiple | Cash App (sent) | $42,940.00 |
| 1/31/2023 | Wire Transfer- Fit Girls Boutique | $25,000.00 |
| 2/1/2023 | Wire Transfer- Fir Girls Boutique | $16,000.00 |

9

## CONCLUSION

48. Based upon my experience and the facts presented in this Affidavit, there is probable cause to believe that between 2021 and the present, in the Southern District of Ohio and elsewhere, **NICHOLAS PRICE** engaged in a wire fraud scheme, in violation of 18 U.S.C. § 1343, and laundered the proceeds by concealing the nature of the funds, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

*Kyle Borton*

Kyle Borton
Special Agent, IRS-CI

Subscribed and sworn to before me

This    28th    day of    February   ,    2024  .

*Kimberly A. Jolson*
Kimberly A. Jolson
United States Magistrate Judge

10